INTERNATIONAL SHOE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 82264, 82265, 83607, 87162. Promulgated July 19, 1938.

*Richard O. Rumer, Esq., R. E. Blake, Esq.,* and *Charles B. McInnis, Esq.,* for the petitioner.

*Frank M. Thompson, Jr., Esq.,* and *Joseph B. Harlacher, Esq.,* for the respondent.

88

OPINION.

Smith: 1. The first question presented by these proceedings is whether the International Shoe Co. and the Illinois-International Shoe Co. are entitled to deduct from gross income of the fiscal years 1932 and 1933 the amounts paid out for lasts, dies, and patterns.

From the beginning of business of each company all amounts paid out for lasts, dies, and patterns have been charged to expense and deducted from gross income as ordinary and necessary expenses of operation. They have been charged to expense upon the company's books of account because lasts, dies, and patterns are continually being replaced by new purchases, have ordinarily a life of not to exceed one year, and have no resale value. The respondent never raised any question as to the right of each company to deduct the amounts thus charged to expense up to the time of an audit of the tax returns for the fiscal year ended November 30, 1932. He then held that the cost of lasts, dies, and patterns should be capitalized and such capitalized cost charged off over a two-year period, the assumed economic life of such items. In the absence of definite information as to dates of purchase during each year, the respondent assumed that the average date of purchase was June 1, that is, the middle of each year. He then determined that the cost should be charged off as follows: 25 percent in the year of purchase, 50 percent in the following year, and 25 percent in the third year. In his brief he states:

A simple illustration will probably show more clearly than in any other manner the position taken by the Commissioner in his treatment of petitioner's ex-

penditures for lasts, dies and patterns. Assuming that the annual purchases in a single factory amount to an average of $50,000 a year, the following computation illustrates his method of handling the items based upon an average two-year life:

| | Cost | Depreciation | | |
| | | 1932 | 1933 | 1934 |
|---|---|---|---|---|
| 1932 | $50,000.00 | $12,500.00 | $25,000.00 | $12,500.00 |
| 1933 | 50,000.00 | | 12,500.00 | 25,000.00 |
| 1934 | 50,000.00 | | | 12,500.00 |
| | $150,000.00 | $12,500.00 | $37,500.00 | $50,000.00 |

Since the petitioner had charged off to expense the entire cost of lasts, dies, and patterns purchased up to the close of the fiscal year ended November 30, 1931, the only portion of the cost of such items accrued during the fiscal year 1932 is 25 percent of the cost—except that the respondent has allowed as a deduction the cost of remodeling lasts done by the petitioner's own employees.

The taxing statute provides that:

The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * * [Sec. 41, Revenue Act of 1932.]

The statute further provides for the deduction from gross income of "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." (Sec. 23 (k), Revenue Act of 1932.)

Regulations 77 were promulgated under the provisions of the Revenue Act of 1932. In article 323 it is provided:

It is recognized that no uniform method of accounting can be prescribed for all taxpayers, and the law contemplates that each taxpayer shall adopt such forms and systems of accounting as are in his judgment best suited to his purpose. Each taxpayer is required by law to make a return of his true income. He must, therefore, maintain such accounting records as will enable him to do so. * * *

* * * * * * *

(2) Expenditures made during the year should be properly classified as between capital and expense; that is to say, expenditures for items of plant, equipment, etc., which have a useful life extending substantially beyond the year should be charged to a capital account and not to an expense account; * * *

Article 342 provides in part:

Each year's return, so far as practicable, both as to gross income and deductions therefrom, should be complete in itself, and taxpayers are expected to

make every reasonable effort to ascertain the facts necessary to make a correct return. The expenses, liabilities, or deficit of one year can not be used to reduce the income of a subsequent year. * * * A taxpayer has the right to deduct all authorized allowances, and it follows that if he does not within any year deduct certain of his expenses, losses, interest, taxes, or other charges, he can not deduct them from the income of the next or any succeeding year. It is recognized, however, that particularly in a going business of any magnitude there are certain overlapping items both of income and deduction, and so long as these overlapping items do not materially distort the income they may be included in the year in which the taxpayer, pursuant to a consistent policy, takes them into his accounts. * * *

The evidence in these proceedings clearly disproves the respondent's contention that the lasts, dies, and patterns used in the business of the two shoe companies have an economic life of two years. The average life of those used in connection with the manufacture of style shoes was not in excess of one year and in many cases the lasts, dies, and patterns gotten out for a particular style of shoe had a life of less than six months. The International Shoe Co. has shown for a five-year period, including the fiscal years in question in these proceedings, the respective percentages of its staple and style shoes to its total production. The average respective percentages for this period were 13.7 percent staple and 86.3 percent style. It has further shown that during the fiscal years 1930 to 1936 the amounts spent for the purchase of lasts, dies, and patterns used in manufacturing staple shoes was only 1.4 percent of the total of such expenditures and that the remaining 98.6 percent was used in producing style shoes.

The petitioner does not contend that in no case did lasts, dies, and patterns have an economic value not to exceed one year. It admits that those used in the manufacture of staple shoes had a life somewhat longer than one year, but it insists and the proof shows that most of the expense for lasts, dies, and patterns for the fiscal years here in question was for style production and that they had a life not to exceed one year.

Substantially the same question as is presented by these proceedings was before the Board in *Conrad Shoe Co.*, 1 B. T. A. 798. That case involved the taxable years 1919 and 1920—a period when, according to the evidence in these proceedings, the style feature was of much less importance than it was during the fiscal years 1932 and 1933. In that case, the taxpayer had been engaged prior to 1920 in the production of the so-called standard style shoes. It had followed the practice of capitalizing its expenditures for lasts, dies, and patterns and depreciating such expenditures on the basis of 50 percent in the year of purchase and 50 percent in the following year. During 1920 the taxpayer changed its production from the standard style shoes to style shoes and wrote off as a deduction in the year

1920 its total expenditures for lasts, dies, and patterns in that year. In the same year it deducted the remaining 50 percent of its 1919 expenditures for lasts, dies, and patterns. The Commissioner approved the deduction of the taxpayer's 1920 expenditures, but refused to permit it to deduct the remaining 50 percent of its 1919 expenditures in the year 1920.

It will be noted that in that case the Commissioner was contending that the cost of lasts, dies, and patterns was an expense of the year of purchase. Hence, his contention that the taxpayer was not entitled to deduct, from the gross income of 1920, 50 percent of the cost of lasts, dies, and patterns acquired in 1919. The Board held, however, that the taxpayer was entitled to deduct in 1920 not only the amount spent for lasts, dies, and patterns in that year, but also the unamortized cost of the standard style lasts, dies, and patterns acquired in 1919.

The lasts, dies, and patterns purchased by the petitioner during the two fiscal years before us did not expand its production facilities. They merely enabled it to keep abreast of the times and to present merchandise to the public that had a sales appeal. The amounts spent merely served to replace obsolete lasts, dies, and patterns by new lasts, dies, and patterns. The evidence is all to the effect that they had no asset value in the sense that they could be sold for any amount whatever.

It appears to us that the situation here is much the same as that which obtained in *United States* v. *Roden Coal Co.*, 39 Fed. (2d) 425; *Marsh Fork Coal Co.* v. *Lucas*, 42 Fed. (2d) 83; *Commissioner* v. *Brier Hill Collieries*, 50 Fed. (2d) 777; *West Virginia-Pittsburgh Coal Co.*, 24 B. T. A. 234; *Tennessee Consolidated Coal Co.*, 24 B. T. A. 369; *Preston County Coke Co.*, 24 B. T. A. 646; *Cunard Coal Co.*, 26 B. T. A. 234. The question in the above cited cases was whether a coal mining company was entitled to deduct from gross income as an expense the cost of equipment which served to keep up the production of the mine. There was no question but that many of the assets acquired, such as electric locomotives, had a useful life of many years. The courts held, however, that the mere fact that they had a useful life of more than one year was not determinative of the question whether the amounts constituted ordinary and necessary expenses deductible from gross income. In each case the amounts spent for such assets were held to be ordinary and necessary expenses and deductible from gross income. Cf. also *Osterloh* v. *Lucas* (C. C. A., 9th Cir.), 37 Fed. (2d) 277; *Welch* v. *Helvering*, 290 U. S. 111.

The action of the respondent in disallowing the deduction from gross income of the amounts spent for lasts, dies, and patterns is reversed.

2. The second question in issue is the rate of depreciation to be used in the determination of the depreciation allowance on machinery and equipment.

As the result of a conference between the petitioner and the respondent's counsel in 1925 it was agreed that a rate of 9 percent should be used in the computation of the depreciation allowance on machinery and equipment. This was the rate which was warranted by the very accurate records kept by the International Shoe Co. over a period of years. Depreciation allowances for prior years were adjusted upon that basis and the same rate of depreciation has been used in computing allowances for depreciation upon machinery and equipment since 1925. The petitioner's records tend to show that the 9 percent composite rate is less rather than more than the rate warranted. Its records for discarded machinery over a period of years warrant the finding that the average useful life of the machines discarded was not in excess of 11⅑ years, which would warrant the 9 percent rate. There is no evidence whatever to support the respondent's determination of a useful life of machinery of 15 years. The action of the respondent in changing the rate of depreciation on machinery and equipment for the taxable years from 9 percent to 6⅔ percent is reversed.

3. The next question relates to the depreciation rate on brick buildings. The petitioner agreed with the respondent in 1925 that a rate of 2½ percent was the correct rate. Its subsequent experience, however, has shown that this rate does not provide for obsolescence actually sustained. With the advent of high speed machinery and changes in manufacturing processes it has been found that multiple-story shoe factories are less satisfactory and less profitable than the one-story type. The petitioner has found it advantageous to abandon and dispose of some of its multiple-story buildings. There is, however, a small market for such buildings and the petitioner's experience has shown that it has been unable to sell the buildings abandoned at the depreciated cost.

In its reports to its stockholders the petitioner deducted from gross income for the fiscal years 1932 and 1933 larger amounts for depreciation of brick buildings than were claimed on the income tax returns. This was for the purpose of presenting to the stockholders a true picture of its finances. The petitioner felt obligated, however, in filing income tax returns to continue with the 2½ percent rate which it had agreed in 1925 was the proper rate to use. Beginning with the fiscal year 1934 the petitioner has claimed on its tax returns a depreciation allowance on its brick buildings based upon a 30-year life, or at the rate of 3⅓ percent. The evidence supports the petitioner's contention for a rate of 3⅓ percent on brick buildings for the fiscal years 1932 and 1933.

4. The final question presented by these proceedings is whether the petitioner is entitled to deduct $150,500 from gross income of 1932, $500 of which represents attorneys' fees and $150,000 the amount paid in settlement of a suit which was instituted against it and its officers and directors. In that suit the plaintiff alleged that the petitioner and its officers had acted illegally and had conspired to injure it. The petitioner never filed any answer to the suit, although it did file demurrers to certain allegations of the petition. The petitioner was receiving much unfavorable publicity as a result of the suit and its officers felt that its business was suffering therefrom.

The petitioner's officers deemed it advisable to consult Charles Nagel, a well known attorney of St. Louis, for the purpose of getting his advice in the matter. Nagel had represented the petitioner in former years. He was not, however, employed as the petitioner's attorney in the case. After spending about a month in investigating the situation Nagel reached the conclusion that there was practically no merit in the plaintiff's claims but that it might be advisable to negotiate a settlement by reason of the fact that a former president of the petitioner, no longer living, was implicated in the suit and if the case went to the jury it might not be possible to convince the jury that some of the contentions of the plaintiff were not well founded. Nagel was instructed to ascertain what arrangements could be made for a settlement of the suit and he advised the petitioner that the entire proceeding could be settled upon payment of $150,000. That payment was made. In addition to that, $500 was paid a prior attorney who had filed one or more motions with the court.

The respondent contends that the amount paid was not an ordinary and necessary expense of the petitioner in 1932, and cites in support of his contention *National Outdoor Advertising Bureau, Inc.* v. *Helvering*, 89 Fed. (2d) 878. In that case it was held that where a consent decree had been entered in a suit brought by the United States against the National Outdoor Advertising Bureau, Inc., and others declaring that a certain contract was illegal, null, and void, the "Bureau" was not entitled to deduct from its gross income that part of the costs of defending the suit which appertained to the illegal contract.

We are of the opinion that the principle announced by the court in that case has no application to these proceedings. Here there is no evidence that the petitioner and its officers had entered into any conspiracy or committed any illegal act. The petitioner was, however, receiving unfavorable publicity from the suit and its officers considered that it might be advisable to pay a reasonable amount to settle the controversy.

By section 23 of the Revenue Act of 1932 a taxpayer is permitted to deduct from gross income "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." If an expense connected with litigation proximately results from the carrying on of a business, it is a legal deduction from gross income, *Kornhauser* v. *United States*, 276 U. S. 145, providing the expenses are not connected with a criminal prosecution or in connection with a proven illegal act. Cf. *Burroughs Building Material Co.* v. *Commissioner* (C. C. A., 2d Cir.), 47 Fed. (2d) 178; *Gould Paper Co.* v. *Commissioner* (C. C. A., 2d Cir.), 72 Fed. (2d) 698. In *H. M. Howard*, 22 B. T. A. 375, the Board allowed the deduction from gross income of a compromise payment to settle litigation and attorney fees paid in connection therewith, both growing out of and being incidental to the taxpayer's business dealings. In its opinion the Board said:

Though the *Kornhauser* case [the case referred to above] involved only legal fees, we believe the reasoning employed applies equally to the compromise payment made to settle the lawsuit. This expense grew directly out of, and proximately resulted from, the business dealings between the parties. \* \* \*

In *Welch* v. *Helvering*, 290 U. S. 111, Mr. Justice Cardozo, speaking for the Court, said:

\* \* \* Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser* v. *United States*, 276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. \* \* \*

In *Helvering* v. *Community Bond & Mortgage Corporation* (C. C. A., 2d Cir.), 74 Fed. (2d) 727, the Board was affirmed in holding that an amount paid by a corporation for stock of an agency in order to procure the cancellation of an agency contract for the sale of the corporation's stock and thereby preserve the corporation's reputation and avoid a loss of business consequent on the agency's method, constituted an ordinary and necessary expense. The court said:

\* \* \* In the instant case, the taxpayer's reputation was being injured by the conduct of its agent, and its primary motive in seeking the cancellation of the contract was to prevent the loss of earnings. Its contract with the agency proved to be unprofitable. This we think was an expenditure ordinary and necessary in carrying on the business, and deductible from the respondent's gross income.

In *Helvering* v. *Hampton*, 79 Fed. (2d) 358, the Circuit Court of Appeals for the Ninth Circuit affirmed a memorandum opinion of this Board that an amount paid by the taxpayer in settlement of a judgment obtained against him in an action involving fraud was deductible as an ordinary and necessary expense. In the course of its opinion the court said:

> There is no analogy between expenses of the kind here involved and those incurred by one accused of a crime. A suit for damages against a lawyer or doctor by a client or patient arises directly out of the business or profession of such lawyer or doctor. A criminal action against a druggist for violation of the narcotic laws has no direct connection with the druggist's business. If the druggist, on the other hand, were sued for damages by reason of having improperly filled a prescription, the action would arise directly out of the business.

Upon the basis of the holding of the Board and of the courts in the above cited cases the Board holds in the instant proceedings that the amount paid in settlement of the suit brought against it by the Menzies Shoe Co. and the attorneys' fees totaling $150,500 are a legal deduction from gross income.

Reviewed by the Board.

*Judgments will be entered under Rule 50.*