*Decision will be entered under Rule 50.*

THE SECURITY FLOUR MILLS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90137.   Promulgated November 12, 1941.

*Robert C. Foulston, Esq., Harry E. Lunsford, Esq.,* and *Vincent A. Smith, C. P. A.,* for the petitioner.

*R. P. Hertzog, Esq.,* and *J. Y. Porter, Esq.,* for the respondent.

OPINION.

MELLOTT: The findings are more comprehensive than would seem to be required under the issues as stated by us in the beginning. The pleadings, stipulations, evidence, and opening brief of petitioner

indicate that we are being called upon to decide whether petitioner properly excluded $106,604.02 from its gross receipts in 1935. The first section of its opening brief concludes: "It is submitted that $106,604.02 of petitioner's 1935 'gross receipts' did not constitute income until the controversies relating thereto were determined in 1937." Petitioner's argument may be summarized as follows:

At the end of the taxable year 1935 it had accrued upon its books $105,054.70 as processing taxes. When the act was declared invalid (January 6, 1936) this amount was restored to income. It says: Since, *instanter* such unconstitutionality was declared, there accrued or vested a substantial possibility that $1.38 per barrel of flour *sold* (not "processed") during the injunctive period would have to be disbursed either to customers or to the Government, the amount of $106,604.02—the estimated amount which it might be required to repay—was set up on its books, held "in abeyance" or in a "suspense account", and excluded from gross income in its return for 1935. Then, says petitioner, in 1937 the controversies as to these moneys were substantially resolved, whereupon it made reimbursements to its customers totaling $45,865.90 with respect to its 1935 sales. It "then recognized as income, *for the first time*, all of its 1935 gross receipts *except the $45,865.90 thereof which it had refunded to customers*. It * * * is not *now* asking that its income be computed upon the basis of actual income less * * * [the $105,054.70]. * * * *It asks to be permitted to deduct only such reimbursements as it actually made to its vendees*." (The quotations are from petitioner's reply brief.)

Before passing to what seems to be the real issue to be decided on this phase of the proceeding—i. e., the *deductibility* of $45,865.90 from petitioner's 1935 gross income—it may be stated that petitioner relies upon *Commissioner* v. *Brown*, 54 Fed. (2d) 563; certiorari denied, 286 U. S. 556, as authorizing it to set aside the entire $106,-604.02 in a "suspense account" and in refusing to include it in gross income because "a taxpayer is not required to report as income that which he may never be permitted to retain * * *." It points out that the moneys received by it upon the consummation of the injunction suit were "hot moneys"; that it was reasonably certain petitioner would be unable to retain them; that it was legally obligated to repay an equitable portion to its vendees; that it never asserted any claim of absolute ownership to the fund, but treated it as a "suspense account"; and that under the accrual method of accounting such moneys did not become income until all controversy as to their ownership was settled.

The contentions set forth above are not, in our opinion, well founded. No controversy as to the ownership of the proceeds from the sale of petitioner's flour existed. It had increased the selling

price of its flour to include the processing tax and the increased price had been paid by its customers with full knowledge of the facts. It had not legally obligated itself to repay any portion of the sale price to its vendees, nor was there any equitable obligation upon it to do so. As pointed out in *Moundridge Milling Co.* v. *Cream of Wheat Corporation*, 105 Fed. (2d) 366, the sales contracts fixed a "composite price" and did not designate the product sold and the tax separately or provide for the refund of any portions of the payments made on past deliveries. Cf. *Johnson* v. *Igleheart Brothers, Inc.*, 95 Fed. (2d) 4; certiorari denied, 304 U. S. 585. If petitioner were able to save on any of the items going to make up the total cost of the flour which it sold, it thereby increased its profits *pro tanto*. In our opinion the total amount received by petitioner from the sale of its flour constituted gross income to it. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417.

Petitioner next contends that it agreed to settle or compromise its vendees' claims for reimbursement in the year of shipment and that therefore, under a ruling of the Department,[1] it is entitled to treat the reimbursements as deductions from gross income for that year. The substance of the ruling is that processors, keeping their accounts and filing their returns on the accrual basis, may deduct from gross income "for the year in which they agreed with the vendees to settle or compromise the disputed claims", the amounts so agreed upon. Petitioner argues that it "acknowledged its liability in 1935 and has maintained a consistent position throughout." It relies chiefly upon the statements made by its officers to its customers to the effect that they would be treated fairly and as liberally as customers of other mills were treated, which, it says, constituted an agreement ultimately carried out. We do not agree with this contention. The so-called "treat fairly" agreements were no more than assurances given by petitioner to its customers to retain their good will. The testimony of petitioner's officers indicates that they did not intend to bind petitioner to make any repayments to its vendees. Petitioner's counsel and auditor had advised that "it was unsafe to make any definite promises as to amounts that might be paid to the flour buyer." The officers recognized— indeed deliberately chose to bind petitioner no further—that whether any amounts were ever paid to its vendees "would depend upon some other agreement later made." The later agreements, rather than the "treat fairly" promises, were, in our opinion, the bases upon which the payments aggregating $45,865.90 were made.

Having held, as we do that the $45,865.90 must be included in computing petitioner's gross income for the year 1935 and having also held that the payments to its vendees, aggregating that amount, were not

---

[1] G. C. M. 20134, C. B. 1938–1, p. 122.

made pursuant to a specific obligation incurred during the year 1935, we pass to petitioner's contention that the respondent erred "in failing to give due and proper effect to the requirements of sections 41, 42 and 43 of the Revenue Act of 1934 which require the Commissioner to consider credits and deductions for the taxable year in which 'paid or accrued' or 'paid and incurred', dependent upon the method of accounting upon the basis of which the net income is computed and in so disregarding the mandatory provisions of said sections 41, 42 and 43 as to distort and improperly reflect petitioner's income for said period * * *." [2]

The sections relied upon are shown in the margin.[3]

The identical question was before us in *Cannon Valley Milling Co.*, 44 B. T. A. 763, (on appeal C. C. A., 8th Cir.). The petitioner in that case, though under no enforceable obligation in 1935 to pay over to its vendees any of the amount refunded to it in 1936, nevertheless in 1937 paid over a substantial portion of it to them in order to avoid threatened litigation, to keep their good will, and to compromise their claims. We pointed out that the amounts so paid were ordinary and necessary expenses of carrying on a trade or business, citing *Superheater Co.*, 12 B. T. A. 5; affd., 38 Fed. (2d) 69; *O'Day Investment Co.*, 13 B. T. A. 1230; *H. M. Howard*, 22 B. T. A. 375; *International Shoe Co.*, 38 B. T. A. 81, 95; *Helvering v. Hampton*, 79 Fed. (2d) 358; and *Welch v. Helvering*, 290 U. S. 111, and that they were so considered by the Treasury Department;[4] held that section 43 was not

---

[2] Paragraph 4 B, amended and supplemental petition.

[3] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22 (c).)

SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. In the case of the death of a taxpayer there shall be included in computing net income for the taxable period in which falls the date of his death, amounts accrued up to the date of his death if not otherwise properly includible in respect of such period or a prior period.

SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred," dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. In the case of the death of a taxpayer there shall be allowed as deductions and credits for the taxable period in which falls the date of his death, amounts accrued up to the date of his death if not otherwise properly allowable in respect of such period or a prior period.

[4] G. C. M. 20134, C. B. 1938–1, p. 122.

meaningless and should be applied in proper cases; expressed the opinion that the Department could not, by regulation, limit the scope of the section; and concluded that the payments made to the vendees should be allowed as a deduction in computing the taxpayer's income for 1935, since they related to the sales made in that year and did not relate to the sales made in the later period. There is no substantial difference between the facts in the instant proceeding and those in the cited case. The $45,865.90 paid by this petitioner to its vendees represented payments under claims relating to sales made in 1935. If such sales had not been made there would have been no basis for the claims and no reimbursements would have been made. On the authority of the cited case and for the reasons stated therein, we hold that the $45,865.90 in issue here should be allowed as a deduction in computing petitioner's income tax for the year 1935.

The remaining issue arises in connection with respondent's claim that $2,649.25 should be added to petitioner's gross income for the year 1935. His contention is that petitioner, in 1939, was allowed a refund of processing taxes in the total principal amount of $15,928.85, of which $2,649.25 pertained to the taxable year 1935. The stipulated facts have been shown in our findings. They are not entirely clear unless reference is made to some of the figures shown in detail in the exhibits.

During the period the processing tax was being collected (1933 to 1935, inclusive) petitioner deducted from its gross income processing taxes aggregating $318,783.78; $89,151.77 was deducted in 1933, $176,761.05 in 1934, and $52,870.96 in 1935. In the computation attached to the closing agreement the Title VII refund was determined to be $15,928.82 and interest was added in the amount of $4,546.06, making a total of $20,474.88. Petitioner's tax liability under Title III, tax on unjust enrichment, was determined to be $36,880.21. The difference between the latter amount and $20,474.88 or $16,405.33 was paid by petitioner in conformity with the closing agreement. The portion of the "refund" allocable to 1935 was determined by taking $\frac{5287096}{31878378}$ of $15,928.82.

Petitioner contends that the closing agreement was a compromise settlement of its Title III and Title VII controversies upon an aggregate, net basis and that no item in the accompanying schedule can be segregated and held to be a "refund" for the year 1935. It argues that the schedules became submerged into and were superseded by the written agreement; that it is the only competent evidence of the transaction; that it shows merely a payment of an additional amount of tax ($16,405.33) by petitioner; that no amount was ever "refunded" to it; and that even if a "refund" were actually made, it can not be allocated to the various years. We do not believe that any

of these contentions are sound. All of the documents should be considered together. Collectively they show that petitioner was allowed a refund of $20,474.88, which, together with payment of $16,405.33, settled its tax on unjust enrichment under Title III. We think, therefore, that the only question to be considered is whether the refund in 1939 of the amount paid in 1935 as an unconstitutional tax should be determined to be income in the year of receipt, or restored to income for the year in which the deduction was taken.

The question was recently discussed at length by this Board in *E. B. Elliott Co.*, 45 B. T. A. 82, the majority holding "that all refunds of paid taxes are to be adjusted to the years in which the taxes were paid and deductions claimed, as the best method to reflect income; the only proper departure from the rule of adjustment of the refund in the years of payment is where the statute of limitations or some other consideration has made it impossible. In such cases it is obviously inequitable to allow the taxpayer the unjust enrichment which would result and the refund must then be treated as income in the year of receipt." This is determinative of the present controversy. It may be added that, in view of the conclusion reached upon the first issue, it would be highly inequitable to the fiscus to deny the claimed adjustment. On the authority of the cited case this issue is resolved in favor of the respondent.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH, KERN, and OPPER concur in the result on the authority of *E. B. Elliott Co.*, 45 B. T. A. 82, as to both points.

STERNHAGEN, VAN FOSSAN, MURDOCK, AND TYSON dissent.

———

ARNOLD, dissenting: It seems to me that the majority stresses the exception contained in section 43 and ignores the general rule thereof regarding the taking of deductions. The general rule stated in that section, and repeatedly emphasized by the courts and this Board, is that "deductions * * * shall be taken for the taxable year in which 'paid or accrued' or 'paid or incurred,' dependent upon the method of accounting upon the basis of which the net income is computed * * *." Under the general rule the entire amount received from flour sales constituted gross income; with this the majority agrees. Under the general rule no deductions could have been taken in 1935 for liabilities that were not incurred, accrued, or paid until later years; with this the majority agrees. It is my opinion that when the majority reaches this point the issue has been decided and there is no justification for carrying back from 1936, 1937, and 1938 deductions accrued in those years and not paid or accruable in 1935. Peti-

tioner's 1935 income will be clearly reflected by taking into account all items of income and deductions of that annual accounting period.

The majority opinion states that the identical question was before us in *Cannon Valley Milling Co.*, 44 B. T. A. 763 (on appeal C. A. A., 8th Cir.), and on the authority of the cited case and for the reasons stated therein holds that the payments to vendees in 1936, 1937, and 1938 are deductible from 1935 income, although not accruable in that year. The cited case holds that amounts so paid were ordinary and necessary expenses of carrying on a trade or business; that section 43 was not meaningless and should be applied in proper cases; and that respondent could not by regulation limit the scope of section 43. That opinion further points out that few instances have arisen in which the courts or this Board have had occasion to consider section 43 and that the cases relied on by the parties litigant furnished but slight aid in determining the issue. It is important therefore to consider the intent of Congress in its enactment of the exception to the general rule contained in section 43.

The exception, as originally enacted by Congress, first appeared in the Revenue Act of 1921, which provided that *losses* should be deducted in the year "sustained unless, in order to clearly reflect the income, the loss should, in the opinion of the Commissioner, be accounted for as of a different period." Sec. 234 (a) (4).

In the Revenue Act of 1924 Congress extended the exception to *all deductions* and credits. The exception appears in section 200 (d) of that act in identically the same language as it appears in section 43 of the Revenue Act of 1934. All intervening revenue acts and those enacted subsequent to the taxable year contain the exception in the same language.

In explaining the change made in the exception by the Revenue Act of 1924, the Committee on Ways and Means said: "The Revenue Act of 1921 * * * authorizes the Commissioner to allow the deduction of losses in a year other than that in which sustained when, in his opinion, it is necessary to clearly reflect the income. The proposed bill extends that theory to all deductions and credits. The necessity for such a provision arises in cases in which a taxpayer pays in one year interest or rental payments or other items for a period of years. If he is forced to deduct the amount in the year in which paid, it may result in a distortion of his income which will cause him to pay either more or less taxes than he properly should." (H. R. 179, 68th Cong., 1st sess., pp. 10, 11.) The report of the Senate Committee on Finance is to the same effect and in identical language (S. Rept. No. 398, 68th Cong. 1st sess., p. 10.)

According to the reports of the Ways and Means Committee and the Senate Finance Committee Congress intended, by the exception,

to make provision for cases in which "a taxpayer pays in one year interest or rental payments or other items for a period of years." The payments made by this petitioner to its vendees were not interest payments in one year for a period of years; the payments were not rental payments made in one year for a period of years; nor were they payments in one year of other items for a period of years. As a matter of fact petitioner paid back in one year (1936, 1937, or 1938) a portion of the price of flour sold in 1935. No payments in one year for a period of years are involved in this proceeding and such payments as were made were not because of any obligation growing out of the sale itself, but primarily for the purpose of retaining the good will and the business of certain selected customers. Since the exception was designed by Congress to prevent the distortion of income which would result from deducting in one year the accumulated deductions of a period of years, I can see no reason to apply the exception to an entirely different situation and under circumstances which violate one of the cardinal rules of income tax law, namely, that tax liability shall be determined on the basis of annual accounting periods.

Furthermore, it seems to me that the Commissioner's regulations for administering the exception are entitled to more weight and consideration than the majority has given thereto. By section 212 of the Revenue Act of 1924 and section 41 of the Revenue Acts of 1934 and 1936 Congress delegated to the Commissioner the power to determine whether the method of accounting employed by a taxpayer clearly reflects its income, and "if the method employed does not clearly reflect the income" the statutes provide that "the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." Since a clear reflection of income requires a determination of the period in which deductions and credits shall be taken, like discretion would seem by implication to be contained in section 43. 3 Paul & Mertens Law of Federal Income Taxation, p. 307.

Respondent's regulations have consistently construed section 43 and its prototypes, as a grant of discretion, in the exercise of which he would allow a deduction as of a different period only in exceptional circumstances. Art. 146, Regulations 62; art. 43-1, Regulations 86 and 94; T. D. 3261, I-1 C. B. 148. The regulations have always required a taxpayer to take the deduction in the year "paid or accrued" or "paid or incurred" and to submit with the return a complete statement of facts upon which it relies to take deductions as of a different taxable year. The Commissioner would then determine from such facts whether the taxpayer was entitled to the deduction for the period requested. The requirement in the regulation is in

my opinion a reasonable one and imposes no hardship upon a taxpayer. The successive reenactment of the statutory provisions without alteration have imparted to the regulations the force and effect of law, *Helvering* v. *Reynolds Tobacco Co.*, 306 U. S. 110, and unless petitioner has complied with the distinct method provided for in the regulations, it can not avail itself of the exception contained in section 43. *Stokes* v. *United States*, 19 Fed. Supp. 577, 580.

Assuming that the exception is applicable to the facts here, the record does not show that this petitioner made any effort to comply with the distinct method provided in the regulations for availing itself of the exception. In my opinion, the petitioner should have so complied if it expected the benefit of the statute. Even if petitioner had complied with the regulations, it is my opinion that the facts and circumstances here are not such as Congress had in mind when it created the exception to the general rule.

For the foregoing reasons I respectfully dissent from the opinion of the majority.