# DECISIONS

OF THE

# UNITED STATES BOARD OF TAX APPEALS.

## APPEAL OF JAMES S. McCANDLESS.[1]

Docket No. 2782.   Decided April 23, 1926.

Upon the evidence, *held*, that the transfer of stock by the tax-
payer in 1921 did not constitute a *bona fide* sale and no deductible
loss was sustained on account thereof. The return for 1921, in-
cluding a deduction on that account, was false and fraudulent
and willfully so made.

*Urban E. Wild, Esq., Arthur S. Hoppe, Esq., E. R. Cameron,
C. P. A.,* and *A. R. Bechtold, C. P. A.,* for the petitioner.
*A. Calder Mackay, Esq., Ward Loveless, Esq., John D. Foley, Esq.,*
and *W. Frank Gibbs, Esq.,* for the Commissioner.

This is an appeal from the determination of a deficiency in in-
come tax in the amount of $7,363.16 for the year 1921, and an added
penalty of $3,681.58 for alleged fraud, or a total deficiency of
$11,044.74.

### FINDINGS OF FACT.

1. The taxpayer is a citizen of the United States and a resident of
Honolulu, Territory of Hawaii.

2. The California-Hawaiian Development Co. is a corporation
which was organized under the laws of the State of California on
or about September 27, 1911.   This company, hereinafter called the
corporation, was organized by the taxpayer and several associates,
among whom was C. G. Bockus, for the purpose of acquiring from
the Sierra Nevada Development Co., an Arizona corporation, certain
mining properties located in Placer County, Calif.   The corporation
was incorporated with a capital stock of 3,000,000 shares having

---

[1] Publication of this decision was withheld pending the action of the Board on the tax-
payer's application for rehearing.—REPORTER.

a par value of $1 each. Sometime in 1909 the taxpayer had purchased shares of stock in the Sierra Nevada Development Co. at the price of $7.50 for shares having a par value of $10 each. These shares were exchanged in 1911 for shares of stock in the corporation at the ratio of 1 for 20, thus making the cost to the taxpayer of such shares in the corporation 37½ cents each. Subsequent to the organization of the corporation, the taxpayer bought other shares of stock therein at prices varying from 50 to 10 cents per share.

3. C. G. Bockus was a resident of Honolulu for many years prior to March, 1922, when he left Honolulu for San Francisco, Calif., where he has since continued to reside. He had been one of the organizers and for some time was the secretary of the corporation. He was a licensed dealer in stocks, bonds, and general securities in the Territory of Hawaii. There had been a number of sales of stock of the corporation in 1920 and 1921. Bockus had procured purchasers for some of it and knew of the sales. He was on terms of intimate friendship and association with the taxpayer and had many business dealings with him over a period of 25 years. The taxpayer treated him practically as a member of his family.

4. On or about December 10, 1921, Bockus, after having heard that the taxpayer desired to sell some of his stock through another broker, called at the office of the taxpayer and asked, "Why not let me do it?" stating that he thought he could sell some shares of the stock of the corporation as he had a similar transaction. Bockus stated to the taxpayer that he had already made a similar arrangement with the taxpayer's brother, John A. McCandless, from whom he understood the taxpayer was "undertaking a similar sale through a broker known as Guy H. Buttolph." Bockus offered to purchase some of the taxpayer's shares at 5 cents per share. At that time no agreement was reached between the parties. The taxpayer subsequently made inquiry among stockholders in Honolulu and ascertained from them that, in their opinion, it had a value of about 5 cents per share. Thereafter, on or about December 21, 1921, Bockus again called upon the taxpayer and at that time he again offered to take shares in the corporation from the taxpayer for 5 cents per share and give his promissory note therefor. During neither of the conversations was mention made by Bockus of any particular number of shares. The taxpayer thereupon delivered to Bockus 159,344 shares of stock of the corporation and took his note on the basis of 5 cents a share. These shares were among those acquired by the taxpayer after the organization of the corporation and were represented by four certificates numbered, respectively, 15, 263, 312, and 395. The certificates were indorsed and delivered by the taxpayer to Bockus and, at the request of Bockus, transferred to him on the books of the corporation and replaced by certificate No. 695, dated December 30,

1921, and made out in his name for the 159,344 shares. Certificate No. 695 was thereafter held by Bockus in his possession until he delivered it to the trustee of his estate in bankruptcy, as hereinafter set forth. The taxpayer received from Bockus a promissory note for $7,967.20, dated December 22, 1921, payable on demand. Bockus was in " straightened circumstances." At that time the taxpayer, on account of his confidential relationship with Bockus, knew in a way his financial condition. On June 30, 1925, the day before it was filed in evidence in this appeal, documentary stamps in the amount of $1.60 were placed on the note and canceled. The taxpayer never made demand on Bockus for payment of the note, nor was any amount ever paid on the note, nor was any interest ever paid thereon. The transaction was entered into and carried out by the taxpayer in the manner set forth, for the purpose of taking a deduction on his income-tax return. The taxpayer stated that one reason he desired to dispose of the stock was that it had been quite a burden to him. Some time in 1922, and prior to the adjudication of Bockus as a bankrupt, but after the transfer to him of the stock, the taxpayer paid an assessment of one-half per cent per share levied upon the shares of stock of the corporation transferred to Bockus. The taxpayer also, on February 11, 1924; paid another assessment which was levied in December, 1923, on the stock transferred to Bockus. Bockus continued to hold certificate No. 695 in his possession until after he was adjudged an involuntary bankrupt on December 28, 1922. He did not list these 159,344 shares of stock among his assets in the schedule in bankruptcy, nor did he list the promissory note given by him to the taxpayer as a liability. On demand, he delivered the certificate, indorsed in blank by him, to the trustee in bankruptcy about the month of October, 1924. The taxpayer, having knowledge of the bankruptcy proceedings, did not file a claim with the trustee for the amount of the note received by him from Bockus, but stated that he would have been willing to destroy the note if it were not for the question raised by the Commissioner with respect to his tax liability which was coming up. The certificate, from the time of its delivery by Bockus, has been held by said trustee as a part of the assets of the estate in bankruptcy. After the transfer of the stock as above set out, Bockus sold other securities to the taxpayer, and, acting as broker, sold other securities for him. The taxpayer paid Bockus his regular commissions in cash on such deals and paid cash for the securities purchased, and no part of the amount due Bockus was credited on the note. The securities sold to the taxpayer had been bought by Bockus with his own money.

5. The taxpayer purchased no shares of the stock of the corporation within a year prior to the sale described in the preceding para-

graph and has purchased no shares of such stock since that time, either from Bockus or any other person.

6. The certificates of stock acquired by the taxpayer and transferred to Bockus were numbered and issued and cost the amounts set forth in the following schedule:

| Certificate No. | Date of purchase by taxpayer. | Number of shares. | Cost per share. | Total cost of purchase. |
|---|---|---|---|---|
| | | | *Cents* | |
| 15 | Nov. 14, 1911 | 50, 000 | 40 | $20, 000. 00 |
| 263 | Aug. 14, 1913 | 38, 322 | 50 | 19, 161. 00 |
| 312 | Mar. 13, 1914 | 32, 708 | 10 | 3, 270. 80 |
| 395 | Dec. 24, 1914 | 38, 314 | 10 | 3, 831. 40 |
| | | 159, 344 | | 46, 263. 20 |

During the period from December 26, 1914, to June 28, 1921, the taxpayer paid assessments amounting to 11 cents per share, or a total of $17,527.84, on the 159,344 shares. The total cost of these shares to the taxpayer was $63,791.04. The cost of certificate No. 15, which was purchased on November 14, 1911, was less than its March 1, 1913, value.

7. The transfer of stock to Bockus referred to in paragraph 4 was not a sale in good faith, but was resorted to by the taxpayer for the purpose of establishing the appearance of a sale without consummating it in actuality. The taxpayer filed a return for the year 1921 in which a loss was claimed on account of that alleged sale, which claim was false, was known to the taxpayer to be false, and was made with intent to evade tax.

OPINION.

TRAMMELL: The taxpayer, in his income-tax return for 1921, took as a deduction a loss in the amount of $67,721.20 on account of a sale of 159,344 shares of stock to Bockus. The Commissioner disallowed any loss on that account, upon the ground that there was in fact no sale of the stock referred to. The taxpayer at the hearing conceded that the amount of the loss claimed was erroneous and that, if he was entitled to any loss, the amount thereof was $58,823.84, because the cost of the stock transferred, and which the taxpayer claims that he sold, was less than the cost which he asserted in his return.

The Commissioner asserts that the transfer of the stock by the taxpayer to Bockus in 1921 was nothing more than a pretended sale, not an actual *bona fide* sale, and that the transaction was entered into for the purpose of evading the payment of tax. The taxpayer admits that the transaction was entered into because he

desired to take a loss for the purpose of deducting the same in his return for the year 1921. If the transaction amounted to an actual sale of the stock, the admission by the taxpayer that it was consummated for the purpose of realizing a loss during that taxable year, in order that he might deduct the same in his income-tax return, is perfectly legitimate and sets forth an intention which is legal and which gives rise to no fraud or illegal intent.

A taxpayer is not entitled, under the statute, to take a loss merely because stock or securities during a taxable year shrink in value, unless the loss is actually realized by a sale or other disposition of such property. It is perfectly legal and proper for a taxpayer to sell such assets at a price representing their reduced value and thus to sustain a deductible loss which is allowed him by the statute. *United States* v. *Isham*, 17 Wall. 496; *Appeal of The Pennsylvania Co., etc.*, 2 B. T. A. 48; *Appeal of Benjamin T. Britt*, 2 B. T. A. 53; *Appeal of Harold B. Clark*, 2 B. T. A. 555.

The question now resolves itself into a question of fact, and that is, whether the taxpayer actually sold the stock in question during the taxable year, or whether the transfer of the stock to Bockus was carried out for the purpose of taking a deduction on account of a loss which had not in fact been sustained. In order to determine whether there was an actual sale or merely a pretended one, it is necessary to look at all facts and circumstances in the case and to consider and weigh all the evidence.

The taxpayer testified that he sold the stock to Bockus, and Bockus testified that he bought it. The taxpayer and Bockus, however, testified to other facts, and we have the testimony of other witnesses. There were facts and circumstances in connection with and surrounding the transaction which can not be ignored. Facts which are not denied by the taxpayer or Bockus must be taken into consideration and a decision can not be made alone upon categorical statements of the parties. In the light of all the testimony, we are convinced that the taxpayer did not make a sale to Bockus of the stock in question in 1921, and that the taxpayer's return for that year, in which he claims a deduction on that account, was willfully false and fraudulent. The facts and circumstances which lead us to this conclusion may be briefly stated.

Bockus, having learned that the taxpayer desired to dispose of some of his stock and that he was undertaking to sell it through another broker, approached the taxpayer and asked him, " Why not let me do it?" The taxpayer and Bockus were on terms of intimate friendship and were closely associated in business affairs. The taxpayer testified that he treated Bockus as practically belonging to the family. They had many business dealings together. The tax-

payer bought securities from Bockus and Bockus acted as the taxpayer's selling agent and sold whatever securities the taxpayer had to sell. During 1920 and 1921 Bockus had sold other stock of the same corporation. Bockus was in a bad financial condition. The taxpayer knew, at least in a general way, of the financial condition of Bockus. He testified that he knew that Bockus was "hard up," although he did not know of any contemplated bankruptcy proceedings. Bockus himself may not have known that his creditors intended to institute such proceedings. About a year after Bockus received the stock and after he had executed to the taxpayer his promissory note in exchange therefor, Bockus was declared an involuntary bankrupt. He did not list the note of the taxpayer as an indebtedness and did not include the stock as an asset, nor did he list it among his assets when he was notified in 1923 that an assessment had been levied on the stock. If he had overlooked the stock in 1922 when the bankruptcy proceedings were instituted, his mind must have been refreshed when the stock was called to his attention by the assessment thereon. The taxpayer, knowing of the bankruptcy proceedings, did not file a claim against the bankrupt, but testified that he would have been willing to destroy the note, except for the question of tax liability which was coming up. Prior to the adjudication in bankruptcy an assessment of one-half cent per share was levied by the corporation upon the stock transferred to Bockus. This assessment was paid by the taxpayer in order to prevent the stock from being sold to satisfy the assessment. On February 11, 1924, another assessment which had been levied on the stock held by Bockus was paid by the taxpayer. This was after Bockus had been declared bankrupt. Neither of the assessments have since been paid by Bockus. The taxpayer testified that one of the reasons that he desired to sell the stock was that it was a burden to him; yet he continued after the transaction to bear the burden of paying assessments thereon. After the transfer of the stock to Bockus, and while the taxpayer held Bockus' note payable on demand, Bockus sold other securities to the taxpayer. These securities had been purchased by Bockus with his own funds and the taxpayer paid to Bockus the consideration therefor in cash. Bockus also sold some securities for the taxpayer and the taxpayer paid him his commission in cash. No part of the money due to Bockus as the result of these transactions was credited or applied on the note held by the taxpayer. The note was payable on demand, and, notwithstanding these transactions, the taxpayer did not make demand and has never made demand for any part of the principal or any interest on the note.

From all the testimony in the case, we are of the opinion that the transfer of the stock by the taxpayer to Bockus in 1921 was not an actual *bona fide* sale, and that the return filed for that year, in which a deduction was claimed on account of such transaction, was willfully false and fraudulent.

> *Order of redetermination will be entered on 30 days' notice, under Rule 50.*

GRAUPNER and PHILLIPS, dissenting: As the only two members of the Board who heard all of the testimony in this appeal, we feel it incumbent on us to express our opinion that the satisfactory evidence in this appeal does not justify the decision of the Board. It is true that certain incidents disclosed by the record may be considered as raising suspicions, but, on the other hand, these same incidents are susceptible of a different interpretation. From the conclusions formed by us, after hearing all of the testimony and seeing the witnesses on the stand, we do not believe the evidence sufficient to support a finding that the sale from the taxpayer to Bockus was not *bona fide*, or that the taxpayer was guilty of fraud.

The Commissioner relied upon the testimony of two revenue agents for the purpose of impeaching the testimony of Bockus. We are agreed that it is too evasive and too contradictory to be worthy of belief. As we observed their conduct on the witness stand, we were impressed with the belief that they were overanxious to convict the taxpayer and too willing to make damaging deductions from small incidents. But apparently some weight has been given their testimony in the prevailing opinion, which refers to the testimony of " other witnesses " than McCandless and Bockus.

Regarding the sale, the evidence shows beyond a doubt that the stock was assigned and the note was given in December, 1921, that the price was fair, that Bockus took the stock into his possession, had it transferred to his own name, and held the certificate therefor in his own possession and control until he was required to surrender it to the trustee of his estate in bankruptcy. There is no evidence that Bockus held the stock in the capacity of trustee or agent for the taxpayer. On the contrary, we have absolute denials of such relationship from both the parties. There is no evidence to show that the taxpayer exercised or attempted to assert any control over or right to possession of the stock after its delivery by him to Bockus. The fact that Bockus had frequently acted as broker in the purchase or sale of securities for the taxpayer raises no presumption that in this case he was not operating on his own account. Nor do the incidents of Bockus going into involuntary bankruptcy, without

setting forth the stock in question in the schedule filed by him, or of the taxpayer failing to file a claim in bankruptcy on the note held by him, raise any presumption of the relationship of trustee and trustor between them. The individual actions of Bockus should not be permitted to reflect on the actions and attitude of the taxpayer, unless collusion was proven, which it was not.

Bockus was declared an involuntary bankrupt on the petition of creditors in Honolulu, while he resided in San Francisco. The schedule was prepared in Honolulu and sent to Bockus, and he signed it as thus prepared. Other assets and liabilities were omitted from the schedule, including Bockus' home in Honolulu and debts due from him secured by mortgage thereon. Many creditors fail to file claims in bankruptcy where the futility of collection is apparent, and there is no reason to distinguish the taxpayer from other creditors. It must be borne in mind that the taxpayer was traveling about the United States on matters wholly unrelated to his business in Honolulu during all of the period over which the so-called suspicious circumstances were spread, and he was paying little or no attention to his affairs at home. This circumstance might more readily account for his failure to demand payment of the note from Bockus than as assumed evidence of Bockus being agent for the taxpayer.

The payment by the taxpayer of the assessment on all of the stock owned by Bockus was not, in our opinion, evidence of other than a generous and over-indulgent attitude on the part of the taxpayer toward the man he considered as a friend. Apparently, these loans were made as a matter of course, without any thought of the status of the stock ownership. The taxpayer loaned money to others, who never had purchased any stock from him, with which to pay these same assessments. It may be that Bockus was unworthy of this friendship, but his conduct, unless in collusion with the taxpayer, should not influence the decision of this appeal.

Stress is laid upon the financial condition of Bockus. All of the evidence in the appeal is to the effect that, in December, 1921, when the transaction took place, Bockus was solvent, although pressed for cash to use in his business. It was not until a year later that bankruptcy proceedings were instituted, and this came about by reason of the failure of a company in which Bockus was financially interested.

We believe that from the evidence the transaction between the parties was a sale and that the taxpayer is entitled to the deduction claimed. We further believe that there is no evidence to warrant any finding of fraud.