Estate of Charles P. Skouras, Deceased, Charles P. Skouras, Jr., George P. Skouras, Spyros P. Skouras and John B. Bertero, Executors, et al. [1] v. Commissioner. Estate of Skouras v. Commissioner
Docket Nos. 74929-74934.
United States Tax Court
T.C. Memo 1962-33; 1962 Tax Ct. Memo LEXIS 271; 21 T.C.M. (CCH) 152; T.C.M. (RIA) 62033; February 23, 1962
*271 1. C, lessee under a long-term lease, subleases to I, which in turn subleases to R. B contracts to manage the property for R. C and I are wholly-owned subsidiaries of U while R is owned equally by U and B. After almost two decades of mutually-arranged amendments and extensions of the subleases and the management contracts, C sells its remaining leasehold interest to D for a small fraction of its then fair market value. D, also, is owned equally by U and B. Held: Respondent sustained in disallowing C's deduction of the difference between its basis in the leasehold and what it received on the transfer, which is treated as a sham transaction. 2. A plan of reorganization under a court-supervised receivership provides that the receiver and U are each to acquire one-half the stock of a reorganized subsidiary of the corporation in receivership. A proposal that U acquire the entire stock is approved, over the objections of one group of creditors, by the judge in charge of the receivership proceedings. U then sells 30 percent of the stock to certain stockholders of S, a corporation related to the bankrupt corporation. That judge is subsequently convicted of having sold justice. The creditors *272 who dissented earlier reopen the receivership proceedings to investigate possible improper relationship between that judge and U and S regarding that transaction. U and S settle with the trustees in the receivership and U pays the attorney fees. Held: Respondent sustained in disallowing deductions by U and S of their settlement payments and the attorney fees. Held, further: Settlement payment by S does not constitute a constructive dividend to S's stockholders who bought shares of the reorganized corporation from U. Kenneth W. Moroney, *273 Esq., 36 W. 44th St., New York, N. Y., for the petitioners. Dean P. Kimball, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income and excess profits taxes for the taxable year ended August 31, 1946, of petitioner, United Artists Theatre Circuit, Inc., of $264,924.43 and $272,850.84, respectively. Respondent also determined deficiencies in petitioners' income taxes for 1947, as follows: Docket
No.
Deficiency
Estate of Charles P. Skouras, Deceased, Charles P. Skouras,
Jr., George P. Skouras, Spyros P. Skouras and John B.
Bertero, Executors
74929
$19,968.65
Florence L. Skouras
74930
19,227.65
United Artists Theatre Circuit, Inc. [2]
74931
51,255.25
Spyros P. Skouras
74932
56,990.27
Skouras Theatres Corporation [3]
74933
55,793.25
George P. Skouras
74934
26,183.91
The issues remaining to be decided in these consolidated cases are: (1) Whether the purported sale of a long-term leasehold by Chicago-United Artists Theatre Corporation to Dearborn-Randolph Corporation *274 was a bona fide sale entitling the seller to deduct as a loss the difference between its adjusted basis in the leasehold and the amount it received on the purported sale; and (2)(a) Whether the settlement payments and legal expenses disbursed by the corporate petitioners in connection with the court approved settlement between those petitioners and the trustees for the insolvent Fox Theatres Corporation were ordinary and necessary business expenses of those petitioners; and (b) Whether the settlement payment by Skouras Theatres Corporation constituted a constructive dividend to the individual petitioners. Issue 1. Findings of Fact Many of the facts have been stipulated and are hereby found as stipulated. Petitioner United Artists Theatre Circuit, Inc. (hereinafter sometimes referred to as "United"), is a corporation organized in 1926 under the laws of Maryland and has its office and place of business at 233 West 49th Street, New York 19, New York. At all times pertinent, United has been engaged principally in the business of exhibiting motion pictures in theaters, some of which were owned by it indirectly through its ownership of the securities of other corporations. *275 During its fiscal year ended August 31, 1946, United was the parent of an affiliated group which included Chicago-United Artists Theatre Corporation (hereinafter sometimes referred to as "Chicago-United"), a Delaware corporation organized in 1927, Illinois-United Artists Theatre Co. (hereinafter sometimes referred to as "Illinois-United"), a Delaware corporation organized on April 2, 1928, and a number of other corporations. At all pertinent times, the entire outstanding capital stock of Chicago-United and Illinois-United was owned by United. Consolidated income and excess profits tax returns for the fiscal year ended August 31, 1946, prepared on the accrual basis, were timely filed by United and its affiliates, including Chicago-United and Illinois-United, with the then collector of internal revenue for the third New York district. By a lease agreement dated February 1, 1927 (hereinafter sometimes referred to as the "basic lease"), Chicago-United became the lessee for a term of 99 years commencing on February 1, 1927, of land and a theater building (United Artists Theatre, formerly known as the Apollo Theatre, and hereinafter sometimes referred to as "the theater") erected thereon *276 located at the southeast corner of Randolph and Dearborn Streets, in Chicago, Illinois. The fee owner and lessor was Leander J. McCormick Building Corporation (hereinafter sometimes referred to as "McCormick"), an Illinois corporation unrelated to United. Under the original terms of the basic lease, Chicago-United was required, as lessee, to pay ground rent to McCormick at the rate of $90,000 per year until April 30, 1941, and then an increased ground rent of $120,000 per year until the expiration of the lease, in 2026. Chicago-United was also obligated to pay all taxes, special assessments, insurance, repairs, and other maintenance costs. The performance of Chicago-United's obligations under that lease was guranteed by United in an instrument dated (like the basic lease) February 1, 1927. The lease provided a method of assignment whereby the assignor would be relieved of any obligations under the lease. The guarantee provided that it would no longer be effective if such an assignment were made. During 1927, Chicago-United renovated the leased premises for use as a motion picture theater under the name of United Artists Theatre, at a total cost of $1,862,000. Thereafter, from December 25, 1927, to *277 April 12, 1928, Chicago-United operated the renovated motion picture theater for its own account. By an agreement dated April 15, 1928, Chicago-United subleased to Illinois-United for a term ending April 14, 1953, the entire premises covered by the basic lease, subject to a sublease of part of the premises to a candy company. As sublessee, Illinois-United was required to pay to Chicago-United rent consisting of a fixed annual sum of $162,500 plus all amounts due by Chicago-United on account of the basic lease. Illinois-United was also required to pay all of the expenses of operation, maintenance, and repair. United guaranteed the performance of Illinois-United's obligations as sublessee, by instruments dated April 23, 1928, June 1, 1933, October 15, 1942, and February 11, 1946. All the guarantees ran in favor of Chicago-United's assignees, as well as Chicago-United. Illinois-United operated the theater from April 12, 1928, to April 4, 1929. 45 W. Randolph St. Theatre Corporation (hereinafter sometimes referred to as "Randolph") had been organized under the laws of Illinois[4] on March 26, 1929, at which time its capital stock was issued in equal shares to United and to Balaban *278 & Katz Corporation (hereinafter sometimes referred to as "B & K"). United continued to own 50 percent of the stock of Randolph, as did B & K, until 1951. At all times pertinent, substantially all of the outstanding capital stock of B & K was owned by Paramount Pictures, Inc. (formerly Paramount Famous Lasky Corporation and hereinafter sometimes referred to as "Paramount"), a New York corporation engaged principally in the business of producing and distributing motion pictures. The ownership of Paramount's outstanding capital stock was widely distributed in the hands of the public. At no time were United and Paramount subject to common control or to common management, through stock ownership or otherwise. Randolph was formed to take over and operate the theater in 1929. Pursuant to an agreement dated April 1, 1929, the signatures to which were not acknowledged before notaries until July 1932, Illinois-United subleased the *279 premises covered by the basic lease (subject to a sublease by Chicago-United of part of the premises to a candy company) to Randolph for a term of years which, under the initial sublease, was to expire in 1939. Randolph was required to pay to Illinois-United, as lessor, rent in the amount of $6,000 per week plus all the ground rent payments in excess of the then present ground rent of $90,000 per year which the basic lease required Chicago-United to pay to McCormick (and which Illinois-United in turn was required to pay to Chicago-United), increases in general taxes on the property over and above the taxes for 1927, special assessments against the property, all increases in insurance premiums on the property over and above the premiums for 1928, and all other charges in connection with the basic lease. Randolph was also required to bear the expenses of operation, maintenance, and repairs, and of property and public liability insurance. As the ultimate sublessee, Randolph operated the theater from April 4, 1929, to August 31, 1950. United and Paramount joined in executing a written guaranty, dated April 1, 1929, the signatures to which were not acknowledged before a notary until July 11, 1932, of *280 the performance by Randolph of its obligations as the sublessee and operator of the United Artists Theatre. At all times pertinent hereto, B & K managed the United Artists Theatre. [5] However, Randolph supplied the basic management for the theatre through its own employees. B & K provided all of the accounting services, oversaw the work of the manager on Randolph's staff, helped to negotiate labor contracts, made bank deposits, and brought potential employees to the attention of Randolph. B & K also advised on the booking of pictures, both because of its interest as a stockholder and because it had an interest under the management agreement in the successful operation of the theater. For many years prior to and including 1946, B & K operated 49 motion picture theaters in Illinois, of which 43 (including the United Artists Theatre) were located in Chicago and its environs. The leasehold *281 interests of United and its affiliates in the United Artists Theatre were their only interests of such nature in the midwest. In the absence of the interest, ability, and activity of B & K, United and its affiliates would not have been able successfully to obtain first-run pictures or other advantageous playing time for the theater during the period from April 4, 1929, to April 15, 1946. During the depression years and thereafter, numerous amendments to the basic lease and the subleases thereunder varied the rentals and other payments required. The basic lease was amended by a supplemental indenture dated January 5, 1933, which reduced the annual rental for the period May 1, 1933, through April 30, 1941, from $90,000 to $65,000 plus 9 percent of the annual gross receipts of the theater in excess of $722,222. A supplemental indenture dated July 28, 1939, further amended the basic lease to continue the ground rent at $65,000 plus 9 percent of theater gross receipts over and above $722,222, except that the basic rent was to increase to $67,000 on May 1, 1941, and to increase by $1,000 per year each year thereafter until it reached $75,000 for the year beginning May 1, 1949, at which *282 level it was to continue until April 30, 1956. Thereafter, the terms of the original lease would govern. The sublease from Chicago-United to Illinois-United was amended as of June 1, 1933, to provide that Illinois-United should pay, in lieu of the annual sum of $162,500 required by the original sublease, a sum sufficient to pay the interest accruing on the outstanding mortgage bonds of Chicago-United, plus any taxes in respect of the interest. In recognition of the fact that almost two-thirds of the bonds outstanding at the time of the 1933 amendment had subsequently been repurchased by Chicago-United, the sublease from it to Illinois-United was further amended as of October 15, 1942, to increase the rental due from Illinois-United. This second supplemental sublease required Illinois-United to pay, in addition to the amount due under the 1933 amendment, $16,500 per year plus 2 1/2 percent of the face value of all bonds redeemed by Chicago between October 15, 1942, and each subsequent semi-annual rental payment date. This would be in addition to the requirement that Illinois-United pay Chicago-United's obligations under the basic lease. On March 31, 1943, Chicago-United entered into *283 a lease for the store space under which it was to collect rent but then transmit the rent to Illinois-United. On February 11, 1946, a further modification of the sublease advanced the expiration date of the sublease to August 31, 1950 (the then current expiration date of the subsublease from Illinois-United to Randolph), and decreased the rental to $5,000 plus the rental and other payments due from Chicago-United to McCormick under the amended basic lease. Illinois-United's expenses under its subleases for fiscal years ending August 31, 1936, through August 31, 1950, follow: Rent equal
Rent to
Real
to bond int.
Insurance
Dearborn-
Ground Rent
Estate Taxes
and 2% tax
Etc.
Randolph
1936
$ 64,999.92
$39,554.57
$27,667.19
$ 196.32
1937
69,107.17
44,658.65
25,386.93
2,866.87
1938
70,743.45
40,326.68
26,161.61
2,066.03
1939
65,000.00
40,873.04
28,049.98
660.17
1940
$ 65,000.00
$37,552.09
$25,510.82
$ 495.91
1941
65,666.66
43,362.15
19,535.94
529.26
1942
67,333.33
42,989.29
18,448.08
838.76
1943
79,757.90
47,335.50
34,320.40
1,274.85
1944
91,999.36
44,114.98
38,289.14
1,180.85
1945
96,442.64
46,252.02
39,757.28
633.35
1946
101,587.80
49,446.43
23,998.71
593.33
$1,875.00
1947
94,503.78
49,058.05
603.38
5,000.00
1948
84,238.06
46,843.24
603.40
5,000.00
1949
74,333.33
71,679.91
686.64
5,000.00
1950
75,000.00
66,010.00
751.88
5,013.59
*284 In turn, the fixed rent due from Randolph to Illinois-United was reduced retroactively to December 1, 1932, by an agreement dated November 15, 1934, (the rent having been paid on the reduced basis since December 1, 1932, pursuant to a letter agreement) from a weekly rental of $6,000 to $3,000 per week plus the first $26,000 of each year's net profits from the operation of the theater. By the same agreement, which was also signed by B & K and United, the $500 per week management fee to B & K then in effect was reduced retroactively to December 1, 1932, to $300 per week (the management fee having been paid on the reduced basis since August 31, 1932). The reduced rental and management fees were to remain in effect until August 31, 1935, unless the period was extended. These figures were again modified by an agreement effective September 1, 1936, which required Randolph to pay a flat $3,500 per week in lieu of all other rental payment obligations, and the lease term was extended to August 31, 1941. Prior unpaid rentals, if any, were forgiven. By an agreement entered into as of May 28, 1941, the sublease to Randolph was extended to August 31, 1942, at the same $3,500 per week. A June 15, 1942, amendment *285 extended the same terms to August 31, 1947. Although this amendment was signed only by officials of Illinois and Randolph, it stated that: It is further understood that the additional compensation provided to be paid to Balaban & Katz Corporation under the terms of the Management Agreement entered into of even date herewith between Randolph and said Balaban & Katz Corporation, shall, despite the fact that as and when earned it shall become an absolute obligation, be deferred or postponed in payment from time to time to the extent necessary to prevent said working fund from being depleted below the sum of $20,000, but such deferred payment shall be paid as promptly after the same shall accrue as may be possible after maintaining said working fund of $20,000 as aforesaid. On July 10, 1945, the sublease to Randolph was again extended on the same terms to August 31, 1950. This extension, too, referred to a management contract of even date with B & K and provided with regard to it in language identical to that quoted above from the 1942 extension. The agreement referred to by the 1942 amendment provided that it would remain in effect until August 31, 1947, and that Randolph was to *286 pay B & K annually five percent of theater receipts (less if B & K's overhead and cost of furnishing services to other theaters averaged less than five percent of those theaters' receipts) plus the first $15,000 of net receipts. B & K's management fee agreements with Randolph, which were essentially similar to those it had with regard to the other theaters it managed, were based on allocations of home office expenses of B & K. Dearborn-Randolph Corporation (hereinafter sometimes referred to as "Dearborn-Randolph") was organized on December 24, 1945, under the laws of Illinois, by United and B & K, each of which contributed $25,000 to and received one-half of the capital stock of the new corporation. At all times here pertinent, United and B & K each owned 50 percent of the outstanding capital stock of Dearborn-Randolph. Dear-born-Randolph was organized for the purpose of purchasing the basic lease for $50,000. By agreement dated April 15, 1946, Chicago-United assigned all of its right, title, and interest in the basic lease to Dearborn-Randolph for a cash consideration of $50,000. No assets other than the $50,000 subscription by United and B & K were acquired by Dearborn-Randolph *287 prior to Chicago-United's transfer to it of the basic lease. This transaction terminated completely United's liability as guarantor of Chicago-United's obligations under the lease to McCormick. By another instrument of even date, Chicago-United assigned to Dearborn-Randolph, for a stated consideration of $10 (which was duly paid), the sublease from Chicago-United to Illinois-United. The $10 paid for the latter assignment was the only consideration ever received therefor by Chicago-United. In a separate document dated the same day, Chicago-United released United from its guarantee of Illinois-United's obligations under the sublease. In another document dated the same day, Chicago-United assigned to Illinois-United any rights it had in a sublease of the store premises located on the theater property. After the date of sale, Chicago-United became a dormant corporation. It is stipulated that on April 15, 1946, the adjusted cost basis to Chicago-United of the basic lease, including the improvements thereon, was $1,014,130.43 and that the basic lease was real property used in the trade or business of Chicago-United and was property of a character subject to the allowance for depreciation *288 provided in section 23(1) of the Internal Revenue Code of 1939. [6]
In their consolidated returns for fiscal year 1946, United and its affiliates claimed a loss deduction in the amount of $964,130.43, which was the difference between the adjusted basis of the basic lease ($1,014,130.43) and the purchase price paid for it by Dearborn-Randolph ($50,000). After the subleases expired in 1950, Dearborn-Randolph operated the theater. On November 10, 1951, United sold its entire holdings in Randolph and Dearborn-Randolph to B & K for $200,000 cash. In 1952, Randolph again took over operation of the theater. Respondent's explanation of his adjustment to United's income on account of this transaction is: (a) You claimed a loss of $964,130.43 on the alleged sale of an improved leasehold during the fiscal year ended August 31, 1946 by Chicago-United Artists Theatre Corporation. It is held that you realized no loss inasmuch as the transaction was not at arms length and did not represent a bona fide sale. Accordingly, the loss claimed is disallowed. At the time of the transfer *289 here at issue from Chicago-United to Dearborn-Randolph the property transferred had a fair market value in excess of $430,000. The transfer in question did not vary control or change the flow of economic benefits. The transfer here at issue was a sham transaction. Opinion United contends that Chicago-United sold to Dearborn-Randolph for $50,000 its remaining interest in a leasehold having a basis to it of $1,014,130.43; that the loss was realized and should be recognized and given effect as a deduction from ordinary income, apparently under section 117(j). Respondent has stipulated to the fact of the transfer, the consideration, and the basis. No contention is made that the loss should be treated as a capital loss. Respondent's view is that the transaction giving rise to the claimed loss was a sham and that the loss resulting therefrom should not be recognized. [7]
*290 We agree with respondent. United contends that, through its wholly-owned subsidiary, it made a bona fide sale of a leasehold interest in the downtown Chicago movie theater property for $50,000 in 1946. At that time, the operator of the theater was enjoying its most profitable year. The operator's sublease and an intervening sublease were to expire in four years. The basic lease would continue for an additional 76 years. United's expert witness contends the sublease of the theater operator had no value in 1946. Yet, in 1951, after net profits had shown substantial declines in each of the preceding five years and the operator of the property had suffered two consecutive loss years, after the effect of television on movie houses had been clearly demonstrated, after the operating corporation's sublease had expired, and with the knowledge that five years thence and thereafter substantially increased rentals would be due from the holder of the basic lease to the freeholder, United was able to dispose of its one-half interests in the former operating corporation and the corporation holding the basic lease, for $200,000. Thus, after five years of increasingly poor performance of the property *291 as a source of revenue, the value of the basic lease, we are told, increased some seven-fold. United would have this Court believe further that the 1946 transaction effectively transferred economic control and benefits even though the purported sale was by one of its wholly-owned subsidiaries to one of its 50 percent-owned subsidiaries, the other 50 percent of which was owned by B & K. This conclusion is to be reached, we are told, despite the facts that United and B & K also each owned 50 percent of Randolph (the corporation operating the theater), that B & K's management contract with Randolph was consistently renewed during the sixteen years prior to the transaction here at issue, and that B & K's management fee was frequently adjusted with relation to sublease amendments and renewals and with regard to its home office costs incurred in furnishing similar services to other theaters. We decline to take this purported transaction at its face value. In Higgins v. Smith, 308 U.S. 473 (1940), the Supreme Court accepted the separate taxable existence of a corporation from its sole stockholder ( id. at 476) but declined to give recognition to a loss incurred *292 on the transfer of securities from the stockholder to the corporation. The Court described with approval the view that Gregory v. Helvering, 293 U.S. 465 (1935), "gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." 308 U.S. at 476. It is not here contended that Chicago - United and Dearborn - Randolph were but one taxable entity. Under these circumstances, United's citation of Moline Properties v. Commissioner, 319 U.S. 436 (1943), for the proposition that "every corporation must be recognized as a separate taxable entity, with its own income, expenses, losses, and deductions, so long as such corporation is endowed with business purpose and activity," is not helpful. Cf. Campbell County State Bank, Incorporated of Herreid, South Dakota, 37 T.C. - (December 11, 1961). Wickwire v. United States, 116 F. 2d 679 (C.A. 6, 1941), came to the same result on a set of facts much closer to that which we face in the instant proceeding. In Wickwire, two individuals, each of whom owned 47 1/2 percent of the Teer-Wickwire Corporation, *293 transferred securities from a joint trading account to the corporation and caused the corporation to transfer securities to the joint account. Each security was transferred at its then current market value. The securities acquired by the individuals were worth more than those acquired by the corporation. Although no cash changed hands to recognize this differential, it was reflected by debits and credits on the corporate books in the accounts of the two stockholders. Each security was transferred at a value less than its basis to the transferor. As to the securities transferred by the individuals, there was a transfer to a corporation in which each individual held only a minority interest, albeit a large minority interest. The Circuit Court of Appeals dismissed the argument that neither stockholder owned a controlling interest by himself and that the corporation was therefore not a controlled corporation, as being a "thin argument * * * [which] lacks sufficient weight to turn the scales against application here of the familiar doctrine that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed - the actual benefit for *294 which the tax is paid.'" Id. at 681. To the argument that each individual taxpayer ran the real risk, upon transfer to the corporation, of losing control over the securities transferred in the event of a falling out with the other major stockholder (the remaining 5 percent of the stock was owned by the plant superintendent), the court answered (at 681): To surmise, as appellants' counsel would have us do, that upon assumed possibility of future discord the astute unincorporated trading partners and incorporated business operatives, Teer and Wickwire, after together transferring securities to their jointly controlled corporation for admitted purposes of tax evasion, might ever dissolve considerations of common interest in directing the action of their close corporation in its dealings with respect to the transferred stock would stretch imagination beyond the legitimate scope of legal fiction. The property rights relating to the leasehold transferred here are subject to subleases and related management contracts involving wholly-owned subsidiaries and 50 percent-owned subsidiaries. When we strip away the legal fictions of separate entities, useful and proper though *295 they may be under other circumstances, and the oftamended subleases purporting to create and vary rights in those entities vis-a-vis one another, [8] we see that the transaction here at issue resulted in the same lack of transfer of effective control dealt with in Wickwire. United stresses the fact that the transfer in question was made to a corporation only 50 percent of the stock of which was owned by it. Respondent is chided for suggesting that there is no difference between the case of such a purchaser and the case where the transferee was a wholly-owned subsidiary of the transferor. While it is more likely that a loss will be disallowed in a transaction between a corporation and its wholly-owned subsidiary, this Court and other courts have not hesitated to disallow such losses even where the parties did not have that close a formal relationship, if the evidence *296 indicated the transaction did not "vary control or change the flow of economic benefits." E.g., Wickwire v. United States, supra (transfer to a 47 1/2 percent-owned corporation); Bank of America National Trust & Savings Assn., 15 T.C. 544 (1950), affd. per curiam 193 F. 2d 178 (C.A. 9, 1951) (transfer to another corporation pursuant to a pre-existing agreement to retransfer to a subsidiary of the original transferor); James S. McCandless, 5 B.T.A. 1 (1926) (transfer to a friend); John M. Burdine Realty Co., 20 B.T.A. 54 (1930). United's two expert witnesses testified that the basic lease had a value of approximately the price paid for it at the time of the transfer - $50,000. Respondent's expert appraised the leasehold at $951,000 as of that date. We have considered the testimony of the expert witnesses on both sides, the earnings records of the corporations involved both before and after the transfer of the basic lease, and the sale of United's interests in Randolph and Dearborn-Randolph in 1951. On the basis of the record as a whole, we have found the value to be in excess of $430,000. United argues that if *297 it shows respondent's expert's figure to be "arbitrary and excessive" then the burden shifts to "the Commissioner to prove the amount of the deficiencies, which in turn depend upon the proof of the fair market value of the leasehold at the date of sale." For this proposition United relies upon Taylor v. Commissioner, 70 F. 2d 619 (C.A. 2, 1934), affd. sub nom. Helvering v. Taylor, 293 U.S. 507 (1935). United's reliance is misplaced. Firstly, the issue here is whether the entire loss is to be disallowed because the transaction was a sham. The amount to be disallowed does not depend on whether we find the property had a fair market value of $951,000, $430,000, or any other specific amount. [9] A showing that respondent's witness overestimated the fair market value of the basic lease does not lead to the conclusion that respondent was arbitrary in determining the transaction was a sham. [10]
*298 Secondly, Taylor involved the amount of profit determined to have been realized on the redemption of preferred stock, which had been acquired in a tax-free exchange together with two different classes of common stock. The taxpayer allocated his entire basis to the redeemed preferred. The Commissioner's reallocation was held by the Circuit Court of Appeals to be "too unreasonable to require positive disproof." 70 F. 2d at 620. Although that court reversed the Board of Tax Appeals' memorandum decision, it refused to direct the Board to find for the taxpayer. Instead, it remanded the proceeding to the Board with instructions to determine a proper allocation unless the taxpayer could show that a proper allocation was impossible or "impracticable." This disposition of the case, affirmed by the Supreme Court, is clearly at variance with what United asks us to do here. We have said, "When actual market prices play no part in a sale of stocks a question at once arises whether the transaction is bona fide. It is not reasonable that a seller is willing to sell property at less than *299 its worth, or that a buyer is willing to buy for more than the reasonable worth of property." Wilhelmina Dauth, 42 B.T.A. 1181, 1189 (1940). We are not given any good reason why the basic lease here was sold at so small a fraction of its apparent worth. The prior history of accommodation between the United interests and the Paramount interests with regard to the property transferred ( Higgins v. Smith, supra, at 480; cf. Clay B. Brown, 37 T.C. - (December 19, 1961)), the great disparity between the sales price and the fair market value of the property at the time of transfer, and the apparent absence of a change in control or flow of economic benefits resulting from the transfer, in light of the record as a whole, cause us to conclude that the transfer was a sham and that no loss should be allowed on account thereof. On this issue we sustain the respondent. Issue 2 Findings of Fact Many of the facts have been stipulated and are hereby found as stipulated. For its fiscal year ended August 31, 1947, United and its affiliates filed timely consolidated returns, prepared on the accrual basis, with the collector of internal revenue for the third New *300 York district. Petitioner Skouras Theatres Corporation (hereinafter sometimes referred to as "Skouras Theatres"), a Delaware corporation organized in 1931, has its principal office and place of business at 233 West 49 Street, New York 19, New York. At all times pertinent hereto, Skouras Theatres was engaged principally in the business of operating motion picture theaters owned or leased by it. For its fiscal year ended October 31, 1947, Skouras Theatres filed with the collector for the third New York district its timely accrual basis income tax return. Petitioner George P. Skouras (hereinafter sometimes referred to as "George") and Spyros P. Skouras (hereinafter sometimes referred to as "Spyros") have their principal offices and places of business at 233 West 49 Street, New York 19, New York, and each filed his timely cash-basis return for the calendar year 1947 with the collector of internal revenue for the third New York district. Decedent, Charles P. Skouras (hereinafter sometimes referred to as "Charles"), whose estate is a petitioner herein, resided in Los Angeles, California, during 1947, and filed his timely cash-basis return for that year with *301 the collector of internal revenue for the sixth California district. Petitioner Florence L. Skouras (hereinafter sometimes referred to as "Florence"), the widow of Charles, resided with her husband in Los Angeles throughout 1947 and filed her timely cash-basis return for that year with the collector of internal revenue for the sixth California district. Florence's interest in this proceeding is grounded upon the fact that any constructive dividend to Charles on account of the payment by Skouras Theatres here at issue would constitute community income to her. On June 4, 1932, an equity receivership proceeding against Fox Theatres Corporation (hereinafter sometimes referred to as "Fox Theatres") was instituted in the United States District Court for the Southern District of New York (Docket No. E69-191), and is still pending. The late Martin T. Manton, then Senior Circuit Judge in the Second Circuit, designated himself to act as the presiding District Judge in that proceeding. Among the assets of Fox Theatres was the entire outstanding capital stock of Fox Metropolitan Playhouses, Inc. (hereinafter sometimes referred to as "Fox Metropolitan"). In 1932, a bankruptcy proceeding entitled *302 In the Matter of Fox Metropolitan Playhouses, Inc., Debtor was instituted in the United States District Court for the Southern District of New York (Docket No. 60195) for the reorganization of Fox Metropolitan under section 77B of the Bankruptcy Act. Thereafter, in the Fox Metropolitan proceeding, the court approved a Plan of Reorganization dated as of February 1, 1935, as modified by Statement of Modifications of May 24, 1935, and June 3, 1935. Pursuant to this plan, a new corporation, Metropolitan Playhouses, Inc., was organized under the laws of New York on August 28, 1935, to take over the business and assets of Fox Metropolitan. At all times since the organization of Skouras Treatres and continuing throughout 1947, George, Spyros and Charles owned all the class A capital stock of Skouras Theatres in the respective percentages of 25, 37 1/2 and 37 1/2, with the power as a class to elect one-half of the directors. In 1931, Skouras Theatres became the lessee of a chain of motion picture theaters owned by Fox Metropolitan in the metropolitan area of New York. Since its organization in 1935 as successor to Fox Metropolitan pursuant to the Plan of Reorganization, Metropolitan Playhouses *303 has been the owner of the entire outstanding class B stock of Skouras Theatres with the power to elect the other half of the directors. Skouras Theatres continued to lease from Metropolitan Playhouses the chain of theaters which it had theretofore leased from Fox Metropolitan. In 1935, after Metropolitan Playhouses had been organized as the successor to Fox Metropolitan, the entire issue of the cumulative voting class A stock of Metropolitan Playhouses was purchased by United for $850,000 cash. The Plan of Reorganization previously adopted in the Fox Metropolitan bankruptcy proceeding had conferred upon the receiver of Fox Theatres the right to acquire one-half of this stock, but Judge Manton allowed the receiver to forego this right and approved the acquisition by United of all the stock. Creditors represented by Robert Aronstein (hereinafter sometimes referred to as "Aronstein") were the only ones who objected in the receivership proceeding to the receiver foregoing the right to purchase this Metropolitan Playhouses stock. Thereafter, on November 26, 1935, pursuant to the Plan of Reorganization, United sold for cash to Keith-Albee-Orpheum Corporation 20 percent of the class A *304 stock of Metropolitan Playhouses. United and Keith-Albee-Orpheum were never, at any time pertinent hereto, subject to either common control or common management, through stock ownership or otherwise. On December 27, 1935, United sold for cash 30 percent of the class A stock of Metropolitan Playhouses to Spyros, George and Charles, who thereafter and throughout the year 1947 owned such stock in the respective percentages of 37 1/2, 25 and 37 1/2. This sale was not called for by the Plan of Reorganization. At no time during 1947 did Spyros, George and Charles, or any of them, own directly or indirectly more than 5 percent of the voting stock of United. The remaining 50 percent of the class A stock of Metropolitan Playhouses has been owned by United at all times since 1935. As a class, the holders of the class A stock had the power to elect 7 of the 10 directors of the corporation, and the holders of the only other issue of stock in Metropolitan Playhouses had the power, as a class, to elect the remaining 3 directors. On January 30, 1939, an order was entered in the equity receivership of Fox Theatres approving a plan proposed by the then equity receivers for the realization upon *305 and liquidation of the assets of the insolvent. Pursuant to this plan, a deed of trust was executed as of February 24, 1939, for the benefit of the creditors and stockholders of Fox Theatres, and all of the property and assets of the equity receivership and of Fox Theatres were turned over to and vested in that trust. In 1938, the Circuit Court of Appeals for the Second Circuit affirmed Judge Manton's conviction on an indictment for conspiracy to obstruct the administration of justice and to defraud the United States. United States v. Manton, 107 F. 2d 834 (C.A. 2, 1938). On January 12, 1945, an order was entered in the continuing equity receivership of Fox Theatres, appointing a special master to take testimony with respect to the receivers' accounts. On May 1, 1946, a further order was entered in the receivership proceedings enlarging the scope of the hearings before the special master and extending his authority to hear evidence and take testimony concerning all transactions theretofore entered into by the receivers pertaining to the assets of the insolvent and its subsidiary and affiliated corporations. The appointment of the special master and the subsequent *306 order enlarging the scope of his authority and of the hearings, were made on applications by Aronstein. The purpose and object of Aronstein's investigation into the transactions of the receivers for Fox Theatres was to prove some bribery or corruption on the part of Judge Manton in connection with these transactions, and specifically in connection with the acquisition by United of all the class A stock of Metropolitan Playhouses. In the course of the proceeding before the special master pursuant to the order of enlargement and in response to subpoenas served on William P. Philips (hereinafter sometimes referred to as "Philips"), vice president and treasurer, and Alfred M. Georger (hereinafter sometimes referred to as "Georger"), comptroller and assistant treasurer of United, the past and current directors, officers, stockholders, agents, employees, and representatives of United, and of Metropolitan Playhouses, Inc., were required to assemble, produce, or prepare to produce information from the books and records of those corporations and from other sources for use in that proceeding. These hearings before the special master extended over many months of 1946 and more than 300 pages *307 of testimony including the testimony of Philips and Georger were taken. This continuing investigation was conducted in the extraordinary atmosphere of suspicion and uncertainty created by the indictment and conviction of Judge Manton in a matter wholly unrelated to the transactions under investigation. Those proceedings threw a cloud over every case Judge Manton ever had anything to do with. There was a prospect of this investigation continuing indefinitely. Aronstein and the receivership's attorneys spoke of issuing many subpoenas and examining many persons. Aronstein made it clear that everyone connected with either Skouras Theatres or United was on his list for investigation. United and Skouras Theatres decided to attempt a settlement with Aronstein and the Fox Theatres trustees, and about August 1946 retained an attorney to attempt to negotiate such a settlement. The settlement negotiations started with a small offer. Finally, the figure offered on behalf of United and Skouras Theatres rose to $250,000. This offer was made by a letter dated January 15, 1947, to the Fox Theatres trustees, in full settlement and compromise of all claims and possible claims arising out of or *308 relating to the acquisition, ownership, dealing with, or disposition by United of class A stock in Metropolitan Playhouses, or the reorganization of Fox Metropolitan leading to the formation of Metropolitan Playhouses. On January 15, 1947, an order was entered in the Fox Theatres receivership proceedings requiring all interested parties to show cause at a hearing on January 31, 1947, why that offer of settlement should not be accepted. The minutes of the hearing on the order to show cause before Judge Knox on January 31, 1947, indicate that the attorneys for the trustees and the creditors informed Judge Knox that: the 1946 investigation "developed certain aspects of that reorganization which, if unexplained, might give rise to certain inferences upon the basis of which the Trustees could probably assert a claim to recover at least half of the stock of the Metropolitan reorganized company from United Artists"; "the prospects of a long and protracted litigation was very evident to all sides, and it was thought desirable to effect some adjustment"; "this is a good strategic time to accept the settlement because the other witnesses we expected to examine may or may not confirm the suspicions *309 that we have had derived from such testimony as has already been submitted"; "I [Aronstein] did admit to them I did not find any evidence of any payments to influence Judge Manton's decision which was one of the things I was looking for. However, I did say that I thought that the creditors did not get a fair opportunity because they did not have possession of all the facts which existed and which were within the knowledge of the other parties, and I thought that that created a civil liability on their part which might give us the right to upset the transaction." Neither United nor Skouras Theatres was ever specifically charged with any form of misconduct; they were not defendants in any formal sense, but simply provided (or expected to provide, in the case of Skouras Theatres) witnesses in the investigation. No determination was ever made on the merits of any claims against United or Skouras Theatres or anyone else with respect to the acquisition, ownership, or disposition of the class A stock of Metropolitan Playhouses or the reorganization of Fox Metropolitan. On January 31, 1947, after the hearing on the order to show cause, Judge Knox entered an order approving the offer *310 in settlement, which recited in part that it appeared to the court that the offer "is in the best interests of the creditors, stockholders, and all other parties and persons interested herein and should be approved; * * *." In carrying out this settlement, United and Skouras Theatres each paid $125,000 to the Fox Theatres trustees during their 1947 taxable years. Judge Knox's order required the trustees, upon receipt of the $250,000 from the corporate petitioners, to "execute, acknowledge and deliver to United Artists Theatre Circuit, Inc. and Skouras Theatres Corporation an instrument in the form of Exhibit A annexed to said offer of settlment dated January 9, 1947." The instrument referred to provided, in full, as follows: KNOW ALL MEN BY THESE PRESENTS, that Fox Theatres Corporation, a corporation organized and existing by and under the laws of the State of New York, and Kenneth P. Steinreich and Leopold Porrino, as Trustees of the Assets of Fox Theatres Corporation under Indenture of Trust dated February 24, 1939, for and in consideration of the sum of Two Hundred and Fifty Thousand Dollars ($250,000.00), lawful money of the United States of America, paid by United Artists *311 Theatre Circuit, Inc. and Skouras Theatres Corporation, the receipt whereof is hereby acknowledged, have remised, released and forever discharged and by these presents do for themselves, their successors and assigns, remise, release and forever discharge United Artists Theatre Circuit, Inc., Skouras Theatres Corporation and Metropolitan Playhouses, Inc., the past and present directors, officers, stockholders, agents, employees and representatives of said corporations, including but not limited to, George P. Skouras, Spyros P. Skouras, Charles P. Skouras and Joseph M. Schenck, and Alfred C. Blumenthal, their respective heirs, executors, administrators, successors and assigns, of and from any and all liability to Fox Theatres Corporation or to Kenneth P. Steinreich and Leopold Porrino, as Trustees as aforesaid, and the successors or assigns of each of them, arising out of or relating to, the acquisition, ownership, dealing with or disposition by United Artists Theatre Circuit, Inc. of the Class A Stock of Metropolitan Playhouses, Inc. and/or the reorganization of Fox Metropolitan Playhouses, Inc. leading to the formation of Metropolitan Playhouses, Inc., EXPRESSLY RESERVING, however, *312 to Fox Theatres Corporation, its creditors and the said Trustees, all claims, rights, suits, proceedings, cause or causes of action if any, as against any person, persons, firm or corporation other than the persons and corporations herein-above enumerated, the FURTHER EXPRESSLY RESERVING any and all claims, rights, suits, proceedings, cause or causes of action, if any, against the above enumerated persons and corporations other than the claims, rights, suits, proceedings, cause or causes of action herein expressly released. United paid attorney's fees and charges of $12,527.65 for legal services rendered to it in connection with the settlement. At no time in the course of the settlement negotiations did the corporate petitioners' attorney in those negotiations represent any client other than United and Skouras Theatres; he did not represent any of the Skouras brothers individually. Nor was any of the Skouras brothers represented individually at the January 31, 1947, hearing by any other attorney. In preparing the release to be executed by the Fox Theatres trustees, the corporate petitioners' attorney included the names of the Skouras brothers, as well as of other people, in order *313 to make the release as comprehensive and definite as possible, in putting an end to the matter. United and Skouras Theatres in their returns for their 1947 taxable years each claimed a deduction of $125,000 for its payment under the settlement agreement with the Fox Theatres trustees as an ordinary and necessary business expense. United also claimed a deduction for its payment of attorney's fees and charges of $12,527.65. Respondent disallowed these deductions on the ground that they did not constitute ordinary and necessary business expenses under the provisions of section 23(a) of the Internal Revenue Code of 1939. Respondent also determined deficiencies as to the individual petitioners Spyros, George, Charles's estate, and Florence for their 1947 taxable years, on the ground that each of these petitioners received a constructive dividend from Skouras Theatres, taxable as ordinary income under section 22(a) of the 1939 Code, as a result of Skouras Theatres' payment of $125,000 to the Fox Theatres trustees under the settlement agreement. The payment by Skouras Theatres to the Fox Theatres trustees of $125,000 did not constitute a constructive dividend to any of the individual *314 petitioners. Issue 2(a) Opinion Respondent views the settlement and attorney fees as expenses incurred in protecting title to the stock acquired as a result of the receivership proceedings under investigation. Respondent also hints that the money may have been paid to forestall the discovery of some improper relationship between the petitioners and Judge Manton. The corporate petitioners argue they feared harassment which would interfere with their business operations. Should the investigators happen upon some unfortunate and inexact use of language by a witness in the investigation, the resultant publicity was likely to adversely affect their business. The expenses were incurred to protect their business. They conclude that the expenditures were ordinary and necessary expenses of their trades or businesses. Respondent comments that scandal connected with a motion picture distributor is not likely to adversely affect the admissions receipts of the motion pictures distributed. Indeed, respondent offers, past experience suggests that it would enhance the drawing power of the pictures, thereby improving the corporate petitioners' business. Respondent argues that the corporate *315 petitioners have not shown any relationship between the $250,000 settlement price and the economic hurt that might result to their trades or businesses from any contemplated harassment. The evidence relating to this issue is meager. No evidence was introduced regarding the views of the officers of the corporate petitioners which led them to offer or agree to such a settlement. No evidence was introduced to show that they really envisioned legal expenses and damages to their business which might exceed the $250,000 they paid in settlement. The only testimony was by the attorney who, 14 years before the hearing in the instant case, had been retained by the corporate petitioners after the investigations and had recommended and negotiated the settlement within a few months after his retention. His testimony does not fill the above-noted voids in petitioners' case. The corporate petitioners have failed to show these expenditures are proximately related to their trades or businesses. See Commissioner v. Shapiro, 278 F. 2d 556, 558-559 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court. Cf. C. Doris H. Pepper, 36 T.C. - (August 28, 1961). Under the circumstances *316 we need not examine into the deductibility of an expenditure connected with a criminal charge. See International Shoe Co., 38 B.T.A. 81, 96-97 (1938); John W. Clark, 30 T.C. 1330 (1958). Nor need we concern ourselves with the extent to which the hearings were primarily an effort to divest United of its stockholdings. See Hochschild v. Commissioner, 161 F. 2d 817 (C.A. 2, 1947); Estate of Joseph P. Morgan, 37 T.C. - (October 13, 1961); Levitt & Sons v. Nunan, 142 F. 2d 795 (C.A. 2, 1944); Levitt & Sons v. Commissioner, 160 F. 2d 209 (C.A. 2, 1947). Petitioners do not contend that an allocation should be made between deductible ordinary and necessary expenses on the one hand and capital or other nondeductible expenses on the other and we see no basis for so allocating. See Levitt & Sons v. Commissioner, supra. We conclude that petitioners have failed to sustain their burden of demonstrating error in respondent's determination that the settlement payment and attorney's fee in connection therewith did not constitute deductible ordinary and necessary business expenses. Issue 2(b) Opinion Respondent *317 maintains that payment by petitioner Skouras Theatres of one-half the settlement price constituted a dividend to the individual petitioners herein. The individual petitioners argue that the payments were made for a proper corporate purpose and that they derived no individual benefit therefrom except to the extent any corporate shareholder derives benefit from proper business expenditures by his corporation. The testimony of the aforementioned attorney on this point was clear and in the absence of contradictory testimony or other persuasive reason (see Jay A. Williams, 28 T.C. 1000, 1001-1002 (1957)and cases there cited) we think conclusive. The attorney was retained by the corporations, considered himself as and held himself out to be the representative of the corporations alone, and negotiated the settlement with a view toward protection of the corporations' interests. Inclusion of the names of the individual petitioners, as well as several other individuals, in the release provisions of the settlement agreement was intended to benefit the corporations whose officers these people were. We conclude that petitioners have demonstrated they received no taxable income, *318 constructively or otherwise, on account of the payment by Skouras Theatres of one-half the settlement price. Respondent's concession with regard to his determination that United did not realize $25,000 income on the transfer of Chicago-United's interest in its sublease with Illinois-United will be given effect in a computation under Rule 50. Deficiency items not contested by any of the individual petitioners will be given effect in computations under Rule 50 in each of the appropriate dockets. Decision will be entered for respondent in Docket No. 74933; decisions will be entered under Rule 50 in Docket Nos. 74929, 74930, 74931, 74932, and 74934. Footnotes
1. Proceedings of the following petitioners are consolidated herewith for trial on motion of the Court: Florence L. Skouras, Docket No. 74930; United Artists Theatre Circuit, Inc., Docket No. 74931; Spyros P. Skouras, Docket No. 74932; Skouras Theatres Corporation, Docket No. 74933; and George P. Skouras, Docket No. 74934.↩
2. Taxable year ended August 31, 1947. ↩
3. Taxable year ended October 31, 1947.↩
4. So stipulated. However, the sublease and petitioners' proposed findings of fact, unobjected to in this regard by respondent, both state that Randolph was organized in Delaware. This question does not appear to be material to any of the issues of this case.↩
5. So stipulated. There is testimonial and documentary evidence that from 1929 to 1932 the theater was managed by Publix Theatres Corporation. Since Publix appears to have been a subsidiary of Paramount, as was B & K, this question does not appear to be material to any of the issues of this case.↩
6. All statutory references herein are to the Internal Revenue Code of 1939 unless indicated otherwise.↩
7. Respondent has specifically abandoned his earlier alternate position that the loss should be disallowed because incurred in a tax-free exchange under section 112(b)(5). Respondent has also abandoned his determination that Chicago-United realized a gain of $25,000 on the transfer to Dearborn-Randolph of its sublease with Illinois-United. It is stipulated that neither B & K, Dearborn-Randolph, United, or any of United's affiliates was a personal holding company at any time relevant to this proceeding. Consequently, the provisions of section 24(b)(1)(C) concerning disallowance of losses on transactions between specified categories of related taxpayers are inapplicable.↩
8. "* * * the realities of the taxpayer's economic interest, rather than the niceties of the conveyancer's art, should determine the power to tax." Helvering v. Safe Deposit Co., 316 U.S. 56, 58↩, fn. 1 (1942).
9. Cf. Pennsylvania Indemnity Co., 30 B.T.A. 413 (1934), affd. per curiam 77 F. 2d 92 (C.A. 3, 1935), certiorari denied 296 U.S. 588 (1935), where the taxpayer was found to have sold property in a bona fide transaction but to have purchased it in a sham transaction. The taxpayer was there allowed to deduct the difference between the sales price and the fair market value of the property on the date is was acquired. To the same effect see G.U.R. Co., 41 B.T.A. 223↩ (1940). 10. Even if United were to convince us that the transfer price was approximately the fair market value of the property, this would be persuasive but not conclusive evidence that the transaction was bona fide. See, e.g., Wickwire v. United States, supra; Thomas S. Hemenway, 11 B.T.A. 1311, 1313 (1928); Canister Co., 30 B.T.A. 895 (1934), affd. per curiam 78 F. 2d 1013 (C.A. 3, 1935); Joseph W. Powell, 34 B.T.A. 655 (1936) (dissent based on fact transfers were at market), affd. 94 F. 2d 483↩ (C.A. 1, 1938).